UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
TERI SANDERS,                                                :
                                                             :  20 Civ. 8428
           Plaintiff,                                  :  ECF Case
                                                             :
           - against -                                 :
                                                             :
INVESCO, LTD, GENUENT GLOBAL, LLC,                           :
and BYRON REGEJ,                                             :  **COMPLAINT**
                                                             :  **AND JURY DEMAND**
           Defendants.                                  :
                                                             :
                                                             :
-------------------------------------------------------------x

      Plaintiff Teri Sanders, by her attorneys, Bantle & Levy LLP, as and for her complaint against Defendants Invesco, Ltd. ("Invesco"), Genuent Global, LLC, ("Genuent"), and Byron Regej ("Regej") alleges as follows:

## NATURE OF THE ACTION

      1.     This is an action for employment discrimination based on race in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. (the "NYCHRL"), and unlawful retaliation in violation of Section 1981, the NYSHRL, and the NYCHRL.  Plaintiff seeks declaratory relief and damages.

      2.     Plaintiff Teri Sanders ("Sanders"), a highly accomplished art director and creative project manager, commenced employment as a Senior Designer at Invesco in October 2019. Invesco contracted with the staffing firm, Genuent, to recruit Sanders for this position.

3. Sanders at all times performed capably in the role and received praise for her work.

4. Following the murder of George Floyd, a Black man, by members of the Minneapolis Police Department in May 2020 and the attendant rise of the Black Lives Matter movement, Invesco began paying lip service to the movement's calls for social and racial justice.

5. Sanders, the only Black employee within Invesco's Acquisitions Marketing Department (the "Department"), became a focus of those efforts.

6. In connection with its efforts regarding the Black Lives Matter movement, white employees approached Sanders, the Department's lone Black employee, to ask what they should say and do to address issues of systemic racism. Invesco stereotyped Sanders by expecting that she speak on behalf of all Black people in response to various inquiries regarding how to achieve racial justice.

7. During one such conversation with her supervisor, Byron Regej, Sanders advocated for workplace equality – "having a voice at the table that is listened to and respected" – as opposed to mere workplace diversity – "having a seat at the table." Regej reacted to Sanders' call for workplace equality negatively and began marginalizing her at Invesco.

8. During a subsequent meeting regarding the Black Lives Matter movement, Regej – who had previously invoked a racist stereotype regarding Black people and fried chicken and expressed some resistance to Sanders' calls to diversify a college basketball marketing campaign developed by the Department – advised Sanders and her colleagues that they "needed to be grateful for what they have" and should not "be angry." Thereafter, Regej cancelled all of his weekly meetings with Sanders and ceased all communications with her.

9. Notwithstanding her successful performance at Invesco, on August 21, 2020, Regej abruptly notified Sanders that she was terminated, citing alleged budgetary concerns.

10. Upon information and belief, shortly thereafter, Invesco hired a white woman to replace Sanders.

11. As set forth in detail below, Invesco's decision to terminate Sanders' employment was motivated by discriminatory animus on account of her race and in retaliation for her protected activity on matters of race.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action under 28 U.S.C. § 1331.

13. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as her Section 1981 claims.

14. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the asserted claims occurred herein.

## PARTIES

15. Sanders, a Black woman, is a resident of the State of New York and currently resides in Brooklyn, New York.

16. Upon information and belief, Invesco is a foreign corporation licensed to do business in the State of New York and maintains offices at 225 Liberty Street, New York, New York 10281.

17. Upon information and belief, Invesco is an independent investment management company.

18.     At all times relevant herein, Invesco is and was an employer within the meaning of the NYSHRL, N.Y. Exec. L. § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

19.     Upon information and belief, Genuent is a foreign limited liability company licensed to do business in the State of New York.

20.     Upon information and belief, Genuent is a staffing company.

21.     At all times relevant herein, Genuent is and was an employer within the meaning of the NYSHRL, N.Y. Exec. L. § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

22.     Upon information and belief, Regej is a resident of the State of New York.

23.     At all times relevant herein, Regej is and was a person within the meaning of the NYSHRL, N.Y. Exec. L. § 292(1), and the NYCHRL, N.Y.C. Admin. Code §§ 8-102.

24.     On October 6, 2020 Sanders filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") in which she alleged that Defendants discriminated against her on the basis of her race and retaliated against her for engaging in protected activity.

25.     As of the date of this Complaint, the EEOC has begun processing Sanders' Charge of Discrimination, EEOC Charge Numbers 520-2021-00071 (Sanders v. Invesco Ltd.) and 520-2021-00072 (Sanders v. Genuent Global, LLC).

26.     Upon issuance by the EEOC of a Right to Sue, Sanders will seek leave to amend this Complaint to assert causes of action against Defendants for employment discrimination on the basis of race and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

## STATEMENT OF FACTS

**Sanders Is Hired by Defendants and Commences Work at Invesco**

27. Sanders, who holds a BFA from the Kansas City Art Institute and an MFA from the School of Visual Arts, is a highly accomplished art director and creative project manager.

28. Over the course of her twenty-plus year professional career, Sanders has held and successfully performed in a number of art director positions for some of the world's most well-known brands, including the Wall Street Journal, Time Inc., and IBM.

29. In October 2019, Sanders was recruited and hired by Invesco as a Senior Designer on the Creative Services Team (the "Creative Services Team") within the Department.

30. Genuent facilitated Sanders' recruitment process, including her hiring by Invesco.

31. Per an Assignment Agreement between Sanders and Genuent dated October 19, 2019 (the "Assignment Agreement"), Sanders was classified as an "employee" of Genuent who would be providing services to Invesco (identified as Genuent's "client").

32. Consistent with the Assignment Agreement, at all times during the course of her employment with Invesco, Sanders' invoices for services rendered, which she issued weekly to Invesco, were paid by Genuent. Upon information and belief, Invesco reimbursed Genuent for all monies paid to Sanders.

33. At all times during the course of her employment with Invesco, Invesco was solely responsible for assigning work to Sanders and supervising her in the performance of that work.

34. At all times during the course of her employment with Invesco, Invesco was solely responsible for controlling Sanders' work schedule.

35. Prior to the onset of the COVID-19 pandemic, Sanders, who was issued an Invesco laptop computer and Invesco email address, worked from Invesco's office in New York City, where she was assigned a desk and a phone.

36. As described in detail below, Invesco notified Sanders via a telephone call on August 21, 2020 that her employment was terminated.

37. No personnel from Genuent participated in that telephone call.

38. Following the termination of her employment with Invesco, Sanders did not receive a termination letter from either Invesco or Genuent.

39. Invesco and Genuent were joint employers of Sanders.

40. Sanders commenced employment with Invesco on October 29, 2019.

41. Sanders performed successfully in her role as Senior Designer.

42. Sanders received substantial praise for the projects that she worked on, including Imagine the Possibilities, Invesco QQQ/NCAA, and the Inside ETF Conference in Miami, Florida.

**Sanders' White Male Supervisor Engages in Racial Stereotyping**

43. As a member of the Creative Services Team, Sanders reported to Byron Regej ("Regej"), Creative Director.

44. Initially, Sanders enjoyed a good working relationship with Regej.

45. However, Sanders' perception of Regej changed after he made a racist comment in her presence and expressed some resistance to her calls to diversify one of Invesco's marketing campaigns.

46. On February 27, 2020, members of the Creative Services Team, including Sanders, Regej, Jessica Decker, Design Director, and Nicole Williams, Photo Editor, had a

6

phone call scheduled with advisors for Trey Brown, a 13-year-old Black entrepreneur with whom Invesco was collaborating on a workshop in which his sportswear designs would be featured.

47. During the call, the Creative Services Team was informed by Brown's advisors that he had been hospitalized and that, consequently, the workshop could not go forward.

48. Regej displayed annoyance and questioned why Brown's advisors were making such a big deal about Brown being sick and said that "it's not like he is dying."

49. Sanders responded that it could be a big deal because he was in the hospital.

50. In response, Regej rhetorically asked, "Why, from eating too much fried chicken?"

51. The members of the Creative Services Team present for Regej's comment reacted to his invocation of that racist trope by sitting in stunned silence.

52. At the same time that it was preparing for the workshop with Trey Brown (Winter 2020), the Creative Services Team was also at work on the Invesco QQQ/NCAA campaign in advance of the annual NCAA Men's Division I Basketball Tournament, which was scheduled to take place in March 2020.

53. During a March 5, 2020 meeting of the Creative Services Team, Sanders noted that the marketing efforts for the Invesco QQQ/NCAA campaign lacked diversity.

54. Specifically, Sanders questioned why Invesco's college basketball campaign featured almost exclusively white athletes since it is common knowledge that Black athletes comprise a substantial portion of Division I college basketball players.

55. Regej expressed some resistance to Sanders' comments about diversifying the campaign.

56. As a result of these episodes, Sanders increasingly believed that Regej was biased and uncomfortable with issues relating to race.

57. Despite her changed perception of Regej, Sanders continued to work hard and perform capably.

**Invesco Purports to Support the Black Lives Matter Movement**

58. Following the murder of George Floyd, a Black man, by police officers in Minneapolis, Minnesota and the attendant rise of the Black Lives Matter movement advocating for racial justice and an end to police brutality, Invesco took steps internally to address the social unrest plaguing the nation.

59. Sanders, the only Black employee in the Department staffed in New York, became a focus of those efforts.

60. On June 1, 2020, Regej emailed the Creative Services Team about the Black Lives Matter movement, advising his direct reports that they should let him know if they wanted to speak with him about it. That same day, Regej also contacted Sanders directly about the Black Lives Matter movement to see how she was feeling.

61. On June 3, 2020, Jon Holding ("Holding"), the head of the Department and Regej's supervisor, sent an invite for a Department-wide town hall meeting to address the Black Lives Matter movement.

62. The next day, June 4, 2020, Holding texted Sanders, asking to speak with her and explaining, "I would like to spend some time on the team call addressing the topic of social injustice. I'd like to see how you are feeling, how you feel about that, and whether you'd like to speak."

63. Holding then phoned Sanders and asked her to speak on the team call on racial justice. Holding told her that the Black Lives Matter movement had caused him to finally realize that he (a white man) was part of the problem, and that the central issue concerned white privilege. During that telephone call, Holding broke down and cried to Sanders.

64. Sanders did not welcome this unsolicited exchange with Holding which put her in the position of having to comfort him over his belated recognition that his race had mistreated Black people.

65. By looking to the Department's one Black employee for answers on how to address racial justice issues, Holding stereotyped Sanders by expecting her to speak for all Black people.

66. At Holding's urging, Sanders agreed to speak at the Department-wide town hall, where she addressed the value of unity in confronting racism.

67. Specifically, Sanders noted that there was no diversity in Invesco's Black Professionals Network, and she encouraged people who were not Black to join.

68. After the town hall, Holding never again spoke with Sanders about issues relating to the Black Lives Matter movement or social or racial justice.

69. Upon information and belief, Holding sought Sanders' participation in the town hall for the sole reason that she was the Department's only Black employee, not because he valued her (or her opinions) as an individual.

70. In this respect, Holding again stereotyped Sanders.

71. On June 5, 2020, Sanders spoke with Regej and told him about her call with Holding and said that she had been forced to comfort Holding when he cried to her.

72. In response, Regej replied that people were "going crazy" over the issue.

**Invesco Terminates its Lone Black Employee in the Department**

73. On June 11, Regej called Sanders and again raised the Black Lives Matter movement.

74. Regej asked Sanders how she was doing and whether she needed to take some time off.

75. Sanders replied that she was okay and that she did not need time off.

76. In response to his inquiries, Sanders expressed to Regej her thoughts about the Black Lives Matter movement and about social justice and equality more generally.

77. Sanders explained her belief that diversity, which she described as "being at the table," is not enough.

78. Sanders expanded by saying that "inclusion," or as she described it, "being at the table and having a voice," is the next step up from diversity, and that "belonging," or "having a voice at the table that is listened to and respected," is the movement's true goal.

79. Regej then asked Sanders, "Are you talking about the world or the Company?"

80. Believing that Black employees at Invesco were not treated equally to white employees, Sanders replied, "Both."

81. In response, Regej made an exasperated sound and abruptly ended their call.

82. At the next meeting of the Creative Services Team, held four days later on June 15, 2020, Regej again referenced the Black Lives Matter movement.

83. Regej told the members of the Creative Services Team that people "needed to be grateful for what they have," cautioning "don't be angry."

84. Though Regej's comments were ostensibly addressed to the entire Creative Services Team, Sanders felt that they were specifically directed at her.

85. Sanders was upset that Regej instructed her to be "grateful" and to not feel angry. She perceived these to be patronizing and demeaning sentiments that have been repeated to Black people through their history in this country.

86. In instructing her to be "grateful" and to not feel angry, Regej stereotyped Sanders by invoking the racist stereotype of the "angry Black woman."

87. Following that meeting, Regej cut off all communications with Sanders and began cancelling his weekly one-on-one meetings with her.

88. After four such meetings had been cancelled, Sanders emailed Regej to ask if anything was wrong and whether he was cancelling his one-on-one meetings with all her colleagues on the Creative Services Team.

89. Regej did not respond to that email.

90. Regej subsequently cancelled all future one-on-one meetings with Sanders, and otherwise caused her to be marginalized on the Creative Services Team.

91. Not knowing what else to do, on August 14, 2020, Sanders contacted Cara Mason ("Mason"), who was the Resources Development Manager at Genuent.

92. Sanders told Mason about Invesco's response to the Black Lives Matter movement and disclosed some of the conversations which had occurred between herself and other Invesco employees.

93. In response, Mason placed the onus on Sanders, asking whether *she* had crossed a line with Regej.

94. At the conclusion of their call, Mason told Sanders that she would contact Regej to check in with him regarding Sanders' employment at Invesco.

95. The following week, Regej phoned Sanders and abruptly terminated her employment, claiming that Invesco had been losing money and that he "had no choice."

96. Upon information and belief, Sanders' termination was approved by Holding.

97. Following her termination, Sanders attempted to speak with Holding about the sudden loss of her employment.

98. He promised to call her and speak with her.

99. Despite his purported sympathy for the Black Lives Matter movement and his supposed concern for Sanders personally, Holding never called Sanders as he promised to do.

100. At the time of her termination, Sanders had received only praise for her work and had received no performance warnings or negative appraisals of any kind.

101. Upon information and belief, Sanders was the only employee in the Department who was terminated in the summer of 2020.

102. Throughout her employment at Invesco, Sanders was repeatedly stereotyped on the basis of her race.

103. Regej became uncomfortable working with Sanders once she asserted her right to be listened to and respected in the same way that white employees are.

104. Regej was motivated to remove Sanders from his team because he erroneously perceived her to be an angry Black woman.

105. Regej was motivated to remove Sanders from his team because he thought that she did not display the gratitude that he expected from a Black person having been given employment at Invesco.

106. Regej had stereotyped views of Black people which caused him to wrongly believe that Sanders was less capable than employees who reported to him who were not African-American.

107. Upon information and belief, Invesco subsequently hired a white woman to replace Sanders on the Creative Services Team.

108. Sanders was subjected to differential and adverse treatment by Defendants on the basis of her race.

109. Sanders' race was a motivating factor in Defendants' decision to terminate her employment.

110. In response to the workplace discrimination that she observed at Invesco, and was personally subjected to, including Regej's use of a racist trope in her presence, Sanders advocated that Invesco become a diverse, inclusive workplace that fostered a sense of true "belonging" for Black employees.

111. Sanders' efforts to promote workplace equality were undertaken in opposition to the workplace discrimination that she observed at Invesco and personally experienced.

112. Sanders' opposition to workplace discrimination was a motivating factor in Defendants' decision to terminate her employment.

113. The actions of Defendants described above were undertaken willfully, intentionally, maliciously and with reckless indifference to Sanders' protected rights.

114. As a result of Defendants' discriminatory and retaliatory termination of Sanders, Sanders was denied income, benefits, and other perquisites of employment, including continuing opportunities for promotion, advancement, recognition, and increased compensation that she otherwise would have received had she not been terminated.

115. In addition, as a result of Defendants' discriminatory and retaliatory termination of Sanders, Sanders has sustained severe mental and emotional harm and distress.

## FIRST CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of 42 U.S.C Section 1981*
*Against Defendants Invesco and Genuent*

116. Plaintiff repeats and realleges the allegations in paragraphs 1 through 115 inclusive as if fully set forth herein.

117. As a result of the aforesaid acts, Defendants Invesco and Genuent discriminated against Plaintiff on account of her race in violation of 42 U.S.C. Section 1981 by terminating Plaintiff's employment because of her race.

118. As a result of Defendants Invesco and Genuent's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SECOND CAUSE OF ACTION
*Retaliation in Violation of 42 U.S.C. Section 1981*
*Against Defendants Invesco and Genuent*

119. Plaintiff repeats and realleges the allegations in paragraphs 1 through 118 inclusive as if fully set forth herein.

120. As a result of the aforesaid acts, Defendants Invesco and Genuent retaliated against Plaintiff for opposing discrimination in the workplace in violation of 42 U.S.C. Section 1981 by terminating Plaintiff's employment in retaliation for her protected activity.

121. As a result of Defendants Invesco and Genuent's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss

of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### THIRD CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of the NYSHRL*
*Against Defendants Invesco and Genuent*

122. Plaintiff repeats and realleges the allegations in paragraphs 1 through 121 inclusive as if fully set forth herein.

123. As a result of the aforesaid acts, Defendants Invesco and Genuent discriminated against Plaintiff on account of her race in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(1)(a), 296-d, by terminating Plaintiff's employment because of her race.

124. As a result of Defendants Invesco and Genuent's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### FOURTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Discrimination on the Basis of Race*
*in Violation of the NYSHRL Against Defendant Regej*

125. Plaintiff repeats and realleges the allegations in paragraphs 1 through 124 inclusive as if fully set forth herein.

126. As a result of the aforesaid acts, Defendant Regej has aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. L. §§ 296(1)(a), 296-d, in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296(6). Specifically, Regej has aided, abetted, incited, compelled, and/or coerced discrimination against Plaintiff based on her race.

127. As a result of Defendant Regej's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## FIFTH CAUSE OF ACTION
*Retaliation in Violation of the NYSHRL*
*Against Defendants Invesco and Genuent*

128. Plaintiff repeats and realleges the allegations in paragraphs 1 through 127 inclusive as if fully set forth herein.

129. As a result of the aforesaid acts, Defendants Invesco and Genuent retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(7), 296-d, by terminating Plaintiff's employment in retaliation for her protected activity.

130. As a result of Defendants Invesco and Genuent's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SIXTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Retaliation*
*in Violation of the NYSHRL Against Defendant Regej*

131. Plaintiff repeats and realleges the allegations in paragraphs 1 through 130 inclusive as if fully set forth herein.

132. As a result of the aforesaid acts, Defendant Regej has aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. L. §§ 296(7), 296-d, in violation of the New York State Human Rights Law, N.Y. Exec. L.

§ 296(6). Specifically, Regej has aided, abetted, incited, compelled, and/or coerced retaliation against Plaintiff in retaliation for her protected activity.

133. As a result of Defendant Regej's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### SEVENTH CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of the NYCHRL*
*Against Defendants Invesco and Genuent*

134. Plaintiff repeats and realleges the allegations in paragraphs 1 through 133 inclusive as if fully set forth herein.

135. As a result of the aforesaid acts, Defendants Invesco and Genuent discriminated against plaintiff on account of her race in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a), by terminating Plaintiff's employment because of her race.

136. As a result of Defendants Invesco and Genuent's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### EIGHTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Discrimination on the Basis of Race*
*in Violation of the NYCHRL Against Defendant Regej*

137. Plaintiff repeats and realleges the allegations in paragraphs 1 through 136 inclusive as if fully set forth herein.

138. As a result of the aforesaid acts, Defendant Regej has aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York City Human Rights Law, N.Y.C.

Admin. Code § 8-107(6). Specifically, Regej has aided, abetted, incited, compelled, and/or coerced discrimination against Plaintiff based on her race.

139. As a result of Defendant Regej's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### NINTH CAUSE OF ACTION
*Retaliation in Violation of the NYCHRL*
*Against Defendants Invesco and Genuent*

140. Plaintiff repeats and realleges the allegations in paragraphs 1 through 139 inclusive as if fully set forth herein.

141. As a result of the aforesaid acts, Defendants Invesco and Genuent retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7), by terminating Plaintiff's employment in retaliation for her protected activity.

142. As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### TENTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Retaliation*
*in Violation of the NYCHRL Against Defendant Regej*

143. Plaintiff repeats and realleges the allegations in paragraphs 1 through 142 inclusive as if fully set forth herein.

144. As a result of the aforesaid acts, Defendant Regej has aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6). Specifically, Regej has aided, abetted, incited, compelled, and/or coerced retaliation against Plaintiff in retaliation for her protected activity.

145. As a result of Defendant Regej's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## JURY DEMAND

146. Plaintiffs hereby demands trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that the Court grant judgment for Plaintiff and that it order and award Plaintiff the following relief against Defendants:

(1) A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*;

(2) Reinstatement to the highest position to which Plaintiff was and would be entitled and/or front pay;

(3) Actual damages in the form of:

    a. back pay with interest based on Plaintiff's appropriate compensation had she not been wrongfully terminated; and

      b.   reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial;

(4)    Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial, but believed to exceed $500,000;

(5)    Punitive damages in an amount not less than $10,000,000;

(6)    Statutory attorneys' fees, costs and disbursements;

(7)    Interest; and

(8)    Such additional relief as the Court deems just and proper.

Dated: October 8, 2020
       New York, New York

                          BANTLE & LEVY LLP

                          *Lee F. Bantle*

                          Lee F. Bantle
                          H. David Krauss
                          99 Park Avenue, Suite 1510
                          New York, NY 10016
                          (212) 228-9666
                          *Attorneys for Plaintiff Teri Sanders*